UNITED STATES DISTRICT
DISTRICT OF MASSACHUSETTS

DEREK GREEN,                        )
                Plaintiff          )
                                   )
v.                                 )       Civil Action No. 11-11711-PBS
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social             )
Security Administration            )
                Defendant

**MEMORANDUM AND ORDER**

February 20, 2013

SARIS, C.U.S.D.J.

## I. INTRODUCTION

Plaintiff Derek Green, who suffers from various alleged mental and physical impairments including depression, anxiety, radial osteomyelitis, seizures, low back pain, obesity, bowing deformity and mitral valve prolapse, seeks review of the decision denying his application for Social Security Disability Insurance benefits ("DIB"), child's disability insurance benefits ("CDB"), and Supplemental Security Income ("SSI") benefits under 42 U.S.C. § 405(g). The Plaintiff has now moved to reverse the Commissioner's denial of benefits, arguing that the Administrative Law Judge ("ALJ") improperly weighed medical opinion evidence when evaluating Plaintiff's residual functional capacity ("RFC"), erred when assessing Plaintiff's credibility,

and relied on flawed vocational expert testimony. Defendant has filed a motion to affirm the decision of the Commissioner.

For the reasons set forth below, the Plaintiff's motion is DENIED and the court allows the Defendant's motion to AFFIRM the decision of the Commissioner.

## II. FACTS

Mr. Green was 26 years old on March 2011 when the ALJ denied his applications. (Tr. 18.) Mr. Green graduated from high school in 2002 and completed approximately one year of college courses. (Tr. 39-42, 478.) His past work experience involves working as a retail cashier and stockperson various stores, including Home Depot, Radio Shack, AC Moore, and Strawberries. (Tr. 13-15, 43.) Mr. Green's work experience also includes working as a promoter for several night clubs. (Tr. 10-11.) Mr. Green alleges disability beginning January 1, 2005. (Tr. 18.)

### A.   Physical Health Conditions

Plaintiff alleges several debilitating physical conditions, including radial osteomyelitis and bowing deformity in his left arm, seizures, lower back pain, obesity, and mitral valve prolapse. Mr. Green has a history of drug abuse and addiction from which many of his physical health conditions stem. He began using opiates recreationally in high school and progressed to using heroin and cocaine together, both by skin popping and IV

injection. (Tr. 281.) Mr. Green reports that his substance abuse has been in remission since 2008. (Tr. 58, 493.)

### 1. Left Arm Osteomyelitis and Bowing Deformity

In April 2008, Mr. Green was admitted to the hospital to treat two abscesses on his left arm that had developed as a result of past drug injections. (Tr. 53.) Mr. Green was diagnosed with radial osteomyelitis and underwent surgery on his left radius and wrist to remove the abscesses. (Tr. 300.) After the surgery, Mr. Green remained in the hospital for seven weeks in order to receive intravenous antibiotics and occupational therapy. (Tr. 53, 280-306.) During that stay, a radiologist observed that Mr. Green had a bowing deformity in the same arm resulting from an old fracture, but did not detect any acute fracture. (Tr. 278, 300.)

After his surgery, Mr. Green reported that it was difficult to get normal movements back in his left arm and that for a period of time he was only able to use his right arm. (Tr. 53-55.) However, by May 12, 2008, an occupational therapist observed that Mr. Green had complete extension in his elbow and that his hand strength had increased substantially. (Tr. 591.) On May 21, the therapist noted that Mr. Green was "eager to use the gym during open gym program" and that he claimed he was a "body builder and love[d] exercise." (Tr. 592.) In fact, Mr. Green was advised that the gym equipment at the hospital was intended to

provide patients with a means to maintain their status and that it was "not for body building." Id.

In March of 2009, Mr. Green reported to a social worker that he had completed physical therapy and felt that he "[was] now recovered." (Tr. 1100.) Mr. Green further claimed that he "[did] not have any other medical conditions and consider[ed] himself a healthy person." Id. In April 2009, Dr. Mayers, a radiologist, examined Mr. Green and found no radiographic evidence of osteomyelitis and no evidence of fracture, dislocation or other bone or soft tissue abnormality. (Tr. 467.) Dr. Mayers did observe that Mr. Green experienced a slightly decreased range of motion of the wrist and "some discomfort" in flexion and extension of the elbow. (Tr. 470.) However, Dr. Mayers also found the Mr. Green had regained full grip strength in his hand. Id.

In October 2009, Dr. Astarijan conducted a case analysis of Mr. Green for the purposes of evaluating his potential disability. Dr. Astarijan concluded that Mr. Green's osteomyelitis had been successfully treated and that he had the full use of his left arm. (Tr. 509.) In May 2010, Mr. Green had a follow-up physical exam with Dr. Monica who noted that there was a nodule on his arm and some swelling in the area because Mr. Green had reportedly slept on his arm in an "odd way" a few days before. (Tr. 1254.) Dr. Monica also noted that Mr. Green had full range of motion of his elbow and wrist and did not report any pain. Id. Additionally, Mr. Green's primary care physician, Dr.

4

Grinspoon, noted in his treatment records for 2010 that Mr. Green was engaging in almost daily exercise. (Tr. 519.)

In January 2011, Dr. Grinspoon filled out an SSA Ability to Do Work-Related Activities form and reported that Mr. Green suffered from exertional limitations related to lifting and carrying. (Tr. 1481-82.) Specifically, Dr. Grinspoon reported that Mr. Green was able to lift less than 10 pounds frequently, but was only able to lift 10 pounds occasionally. Id. In the space provided to elaborate on what medical/clinical finding supported his conclusion, Dr. Grinspoon wrote: "infection/scar left elbow." (Tr. 1482.)

### 2. Past Seizures

In February 2009, Mr. Green disclosed in a Function Report that he had three seizures in the past two years. (Tr. 228.) One of the seizures occurred in 2007 due to a drug overdose. (Tr. 300.) Another occurred in early 2008 due to withdrawal of benzodiazepines, a psychoactive drug. Id. In April 2009, Mr. Green was evaluated by Dr. Mayers, who noted that there had been no recent seizures. (Tr. 469.) Dr. Mayers further observed that a neurologist had examined Mr. Green and had decided not to treat him with antiseizure medication. Id.

### 3. Mitral Valve Prolapse, Obesity, and Lower Back Pain

Mr. Green also reports several other physical health ailments, including lower back pain, obesity and mitral valve prolapse. Pl.'s Mot. Mr. Green reported in his ALJ hearing that he only had the "beginning forms of potential mitral valve prolapse" and that he was currently taking medication for his heart palpitations. (Tr. 56-59.) Mr. Green's medical examinations in November 2004, April 2008, and January 2009 did not reveal any cardiac abnormalities. (Tr. 279, 382, 1471.)

Mr. Green also noted during the hearing that he was substantially overweight. He testified that he was 5'10" and weighed an "unfortunate 290." (Tr. 60.) However, his medical records do not include evidence of medical issues resulting from obesity. Similarly, although Mr. Green alleged lower back pain in his application for benefits, he did not describe this pain in his hearing before the ALJ, nor is there any significant reporting of lower back pain in his records. (Tr. 18.)

### B. Mental Health Conditions

Mr. Green alleges disability resulting from the mental health conditions of anxiety and depression. (Tr. 18.) On several occasions, Mr. Green and his physicians have noted that these conditions have been linked with his drug use and withdrawal.

### 1.   Mr. Green's History of Anxiety and Depression

In August 2005, Mr. Green reported experiencing anxiety to
Dr. Simon, who also noted that Mr. Green exhibited mild
depressive symptoms "without acute issues." (Tr. 387-88.) In a
September 2005 follow-up, Mr. Green informed Dr. Simon that his
symptoms of anxiety had improved with the use of medication
though he felt increased stress because of issues with his family
and the pregnancy of his ex-girlfriend. (Tr. 395.) In October
2005, Dr. Simon observed that Mr. Green "overall fe[lt] better
with less depression." (Tr. 397.) In January 2006, Dr. Simon
noted that Mr. Green had declined to start taking Prozac because
he felt that he did not need the medication. (Tr. 413.) Mr. Green
also reported that he felt his anxiety was "doing much better."
Id. In October 2006, Dr. Simon noted that Mr. Green denied having
depression. (Tr. 937.) However, in August 2007, Mr. Green began
taking anti-depressants. In September he reported that the
medication was "helping" but that "he still ha[d] down days,
usually from withdrawal from drugs." (Tr. 1426.) In January 2008,
a registered nurse found Mr. Green to be a "very pleasant young
man with positive outlook on the future" who planned on "going
back to school for a business degree." (Tr. 1390.)

In April 2008, during his hospitalization for radial
osteomyelitis surgery, Mr. Green received several psychological
evaluations, during which he was noted as being "currently

diagnosed with depression." (Tr. 1114.) However, during a Social Services Assessment, Mr. Green denied that he was suffering from depression; rather, he said that he was feeling "despondent about his drug use." Id. Mr. Green also stated that he was no longer on Prozac, but that he would be willing to try an antidepressant or mood stabilizer. (Tr. 594.) Mr. Green was observed as having a "very stable" mood when he was on proper anti-depressant medication at the time of his June 2, 2008 discharge. (Tr. 534.)

In April 2009, Mr. Green reported that his anxiety was being treated by medication and denied suffering from depression. (Tr. 1079.) Mr. Green also reported that he was experiencing anxiety attacks less than once a week, lasting five to ten minutes each. (Tr. 468.) Around this time, Mr. Green's substance abuse counselor reported that Mr. Green had been "sober for almost a year now" and that he was "motivated" and had "taken control of his life." (Tr. 1098.) That same month, Dr. Grinspoon noted that Mr. Green had problems with anxiety and depression but had started exercising, was trying to lose weight and had aspirations to be a personal trainer again. (Tr. 525.) In October 2009, Dr. Grinspoon referred Mr. Green to a psychiatrist to further evaluate his anxiety and depression. (Tr. 511.) A month later, Dr. Grinspoon noted that Mr. Green felt "life coming back together," thought he was ready for a relationship, and wanted to go back to school that winter. (Tr. 1286.)

In January 2011, on an SSA Ability to Do Work-Related
Activities form, Dr. Grinspoon asserted that Mr. Green had
"marked limitations" in: working in coordination with or
proximity to others without being distracted by them, completing
a normal workday without an unreasonable number and length of
rest periods, interacting appropriately with the general public,
accepting instructions and responding appropriately to criticism
from supervisors, getting along with coworkers or peers without
exhibiting behavioral extremes, responding appropriately to
changes in the work setting, and traveling in unfamiliar places
or using public transportation. (Tr. 1479.) Dr. Grinspoon left
blank the space on the form that was allotted for physicians to
provide a diagnosis and brief indication of what medical or
clinical findings support their assessment. Id. On a separate
form, Dr. Grinspoon reported that Mr. Green's ability to maintain
concentration on work throughout an eight-hour day was
significantly compromised by anxiety. (Tr. 1483.)

Also in January, treating psychologist Dr. Leaf reported
that Mr. Green's Global Assessment Rating ("GAF") was 53 at that
time. (Tr. 1485.) She noted that his highest GAF score over the
past year was 55, while his lowest was 53.[1] Id.

---

[1] The GAF is a clinician's subjective evaluation of an individual's social,
occupational, and psychological functioning. Diagnostic and Statistical Manual
of Mental Disorders, 32-33 (American Psychiatric Ass'n, et. al. eds., 4th ed.,
2000). A GAF score in the range of 51-60 indicates "[m]oderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic attacks) OR moderate
difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)." Id.

In his testimony before the ALJ, Mr. Green also reported that he experienced profuse sweating because of his anxiety and the methadone treatment program he was in, which contributed further to his anxiety and depression. (Tr. 61.)

## 2.  Consultative and Advising Evaluations

On May 12, 2009, Mr. Green had a consultative examination with Mr. Cohen, a licensed clinical psychologist. In the course of his evaluation, Mr. Cohen found that Mr. Green's "behavior and general attitude were appropriate." (Tr. 474-75.) He found no signs of memory or concentration deficits, and noted that Mr. Green's insight and judgment were considered good. Id. In a Functional Summary of Mr. Green's evaluation, Mr. Cohen concluded that Mr. Green should be capable of working an eight-hour day and that his ability to follow work rules was "certainly satisfactory." (Tr. 479.) Mr. Cohen did note that Mr. Green's ability to "relate to co-workers, deal with the public, and interact with supervisors ... would be difficult for him and therefore there is some limitation" because of his depression, lack of confidence, and his panic. (Tr. 479.) Mr. Cohen also found that Mr. Green's ability to "understand, remember, and to carry out complex and detailed job instructions as well as simple ones ... [was] also somewhat impaired for the same reasons." Id. Mr. Cohen assessed Mr. Green's GAF score at 55. (Tr. 480.)

In May of 2009, Dr. Collins-Wooley conducted a psychiatric
review of Mr. Green and concluded that he had only mild
limitations in activities of daily living, maintaining social
functioning and maintaining concentration, persistence, or pace.
(Tr. 491.) Dr. Collins-Wooley concluded that Mr. Green did suffer
from depression and anxiety "in the context of somatic concerns
and recovery from substance dependence" but that his diagnosis
was not severe. (Tr. 481-93.) Dr. Collins-Wooley further noted
that Mr. Green was "managing daily chores and demonstrates
entirely intact attention, concentration, and memory." (Tr. 493.)

In October 2009, Dr. Kellerman conducted another psychiatric
review of Mr. Green. In her evaluation, Dr. Kellerman concluded
that Mr. Green had no functional limitation in activities of
daily living but did have mild limitations in maintaining social
functioning and in maintaining concentration, persistence or
pace. (Tr. 505.) Dr. Kellerman noted that although Mr. Green was
"somewhat depressed and anxious," he had no severe symptoms or
"severe functional intrusion due to these problems." (Tr. 507.)

### III.STANDARD

### A.   Statutory and Regulatory Framework

Plaintiff brings his action to review the Commissioner's
final decision denying his claims for DIB, SSI, and CDB under
sections 205(g) and 1631(c)(3) of the Social Security Act, 42
U.S.C. §§ 405(g), 1383(c)(3). Under the Act, a claimant seeking

benefits must prove that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To meet this definition, a person must have a severe impairment that renders him unable to do his past relevant work or any other substantial gainful work that exists in the economy. 20 C.F.R. § 416.905(a).

The ALJ employs a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1509. The evaluation may be concluded at any step in the process if it is determined that the claimant is or is not disabled. 20 C.F.R. § 404.1520(a)(4). The steps are as follows: 1) if the claimant is engaged in substantial gainful work activity, the application is denied; 2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; if the claimant has a severe impairment, the analysis proceeds to the next step; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do

any other work, the application is granted. Id.; Seavey v.
Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

Residual functional capacity is "the most [a claimant] can
still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).
A claimant's "impairment(s), and any related symptoms, such as
pain, may cause physical and mental limitations that affect what
[he] can do in a work setting." Id. A claimant can adjust to
other work if he can do any jobs that "exist in significant
numbers in the national economy." Id.; § 404.1560(c)(1).

The claimant bears the burden of proof on steps one through
four while on step five, the SSA bears the burden of proof of
coming forward with evidence of specific jobs in the national
economy that the applicant can still perform. Arocho v. Sec'y of
Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

B.   Standard of Review

This Court's authority to review an ALJ's decision is
limited: the Court may only set aside the decision if it resulted
from legal error or if the ALJ's factual findings were not
supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31
(1st Cir. 1999). Substantial evidence means "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." Id. The court must uphold the ALJ's determination
"even if the record arguably could justify a different
conclusion, so long as it is supported by substantial evidence."

<u>Rodriguez Pagan v. Sec'y of Health and Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987). In determining the requisite quantity and quality of the evidence, the court will examine the record as a whole. <u>Rohrberg v. Apfel</u>, 26 F. Supp.2d 303, 306 (D. Mass. 1998).

## IV. PROCEDURAL HISTORY

Plaintiff filed his DIB, SSI and CDB applications on January 21, 2009, alleging disability beginning January 1, 2005. His claims were denied on May 15, 2009 and again upon reconsideration on October 28, 2009. On October 30, 2009, Mr. Green requested an administrative hearing. A hearing was held before ALJ Fulton on January 25, 2011. Prior to the hearing, Plaintiff received notice that a vocational expert would be testifying, though it did not specify that it would be by telephone. (Tr. 121.)

On March 25, 2011, the ALJ issued his decision.(Tr. 15-27.) At step one, the ALJ found that Mr. Green had not engaged in substantial gainful activity since his alleged disability onset date of January 1, 2005. (Tr. 18.) At step two, he found that Mr. Green's mental health impairments of depression and anxiety were "severe" but that his alleged physical disabilities were not. (Tr. 18.) At step three, he found that Mr. Green did not have an impairment or combination of impairments that met the statutory definition of a disability under 20 C.F.C. Part 404, Subpart P, Appendix 1. (Tr. 20.) Next, the ALJ assessed Mr. Green's RFC and found the following:

> [Mr. Green can] perform work without any
> exertional, postural, or environmental limitation
> and with the ability to understand and remember
> simple instructions, to concentrate for 2 hour
> periods over an 8 hour day on simple unskilled
> tasks, to interact appropriately with co-workers
> and supervisors but with a need to avoid work which
> requires close coordination or team work with co-
> workers and a need to avoid work which requires
> frequent contact with the general public, and with
> the ability to adapt to simple changes in the work
> setting.

(Tr. 21.) At step four, the ALJ found that Mr. Green would be
unable to perform his past work, but at step five, he found that
Mr. Green would be capable of performing jobs that exist in
significant numbers in the national economy. (Tr. 25.) Thus, the
ALJ found that Mr. Green was not disabled under the Act.

On August 24, 2011, the Appeals Council denied Mr. Green's
request for review as to the SSI and DIB claims. (Tr. 1-3.) At
that point, the ALJ's decision had become the final decision of
the Commissioner as to those claims. The Appeals Council issued
its decision denying Mr. Green's request for review as to his CDB
claim on July 26, 2012.

The entire case is now ripe for review under 42 U.S.C. §§
405(g) and 1383(c)(3).

## V. DISCUSSION

Plaintiff contends that the ALJ erred both in assessing his
residual functional capacity and in relying on flawed vocational
expert testimony.

### A.   The ALJ's RFC Determination

Plaintiff argues that the ALJ improperly assessed his RFC for two main reasons. First, he argues the ALJ improperly weighed the opinion of his treating physician. Second, he argues the ALJ incorrectly assessed his credibility. The Court finds neither of these arguments persuasive.

### 1.   Weight of Dr. Grinspoon's Opinion

A treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as a patient's own physician, psychologist, or other acceptable medical source who has provided medical treatment in an ongoing way. A treatment provider's opinion is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include the length of the treatment relationship, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c)(5). The ALJ must give "good reasons" for the weight he ultimately assigns to the opinion. Id.

### i.   Dr. Grinspoon's Opinion on Mental Health Issues

The ALJ accorded Dr. Grinspoon's opinion less weight in part because Dr. Grinspoon is "not a psychiatrist" and therefore is not a specialist in mental health issues. (Tr. 24.) The ALJ reasoned that "[w]hile Dr. Grinspoon is able to make observations[,] his opinion is not entitled to any special weight" and noted specifically that Dr. Grinspoon "felt the need to refer the claimant to psychiatric specialists." (Tr. 25.) See Barrientos v. Sec'y of Health & Human Services, 820 F.2d 1 (1st Cir. 1987) (affirming ALJ finding that opinion of psychiatrist was not entitled to greater weight than consulting neurologist merely because the psychiatrist was disability claimant's treating physician). Additionally, the ALJ gave less weight to Dr. Grinspoon's opinion because he offered only sparse medical and clinical findings to support his assessment. (Tr. 24.) Under the regulations, the less a medical source presents relevant evidence to support an opinion, the less weight it is entitled. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). In this case, the ALJ specifically noted that Dr. Grinspoon left completely blank a space on a form allocated for an elaboration of his findings. Id. Given his lack of expertise and sparse showing of support for his findings, the Court finds that the ALJ did not err in according little weight to Dr. Grinspoon's opinion.

Additionally, Dr. Grinspoon's opinion was inconsistent with the record as a whole, which also merits less weight. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Mr. Green's medical records

reflect that medication has substantially helped him deal with his depression and anxiety. (Tr. 1426.) Mr. Green himself has reported that he has experienced mood stabilization and an increased outlook on his future. (Tr. 1426, 1286.) Additionally, Dr. Grinspoon's treatment notes for November 2009 indicate that Plaintiff had reported that he was not depressed and felt his life was "coming back together." (Tr. 1286, 1479.) Dr. Grinspoon's internal inconsistencies in his treatment records, when coupled with the contrary evidence in the record as a whole, give the ALJ ample support in the evidence to accord Dr. Grinspoon's opinion lesser weight.

Plaintiff's argument that the ALJ's decision was based on nothing more than his layperson's assessment of the evidence is therefore unavailing. The ALJ specifically relied on findings by Mr. Cohen, a licensed clinical psychologist, and discussed in depth the opinions of Dr. Collins-Wooley and Dr. Kellerman. The ALJ, in discussing Mr. Cohen's evaluation of the Plaintiff, noted that he demonstrated: 1) satisfactory ability to follow work rules in the context of an eight-hour workday; 2) good ability to use his judgment; 3) some limitation in relating to co-workers, supervisors, and the public; and 4) some impairment in concentrating and carrying out instructions.[2] (Tr. 22). Mr.

---

[2]In his assessment, Mr. Cohen wrote that Mr. Green's ability "to understand, remember, and carry out complex and detailed job instructions as well as simple ones I think is also somewhat impaired." (Tr. 479). Plaintiff attempts to convert this assessment into one supporting the idea that Mr. Green had as

Cohen's evaluations are consistent with those of Dr. Collins-Wooley and Dr. Kellerman, both advising psychologists, who found mild or no restrictions in Plaintiff's activities of daily living, maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation.[3] (Tr. 22-23, 505, 491.)

The ALJ's assessment of Plaintiff's mental health was also supported by the GAF scores reported by Mr. Cohen and Dr. Leaf. Notably, Dr. Leaf is a treating psychologist, whose opinion is entitled to greater weight. While GAF scores do not provide a highly specific assessment of one's residual functional capacity, they do provide an overall indication of a claimant's functioning. In his decision, the ALJ noted that Mr. Cohen reported Mr. Green's GAF score at 55 and Dr. Leaf assessed it at 53, noting that it had been consistent over the course of a year. Provided that the ALJ considers the record as a whole, GAF scores can be a helpful diagnostic tool; it is only when ALJs rely on GAF scores as "a yardstick for measuring disabilities within the

---

much difficulty with simple instructions as he did with complex instructions by setting off "as well as simple ones" in commas and adding italics. However, the original syntax of the sentence does not support Plaintiff's interpretation. Therefore, the Court finds that the ALJ did not err in his reliance on Mr. Cohen's findings.

[3]The ALJ noted in his decision that he gave Dr. Collins-Wooley and Dr. Kellerman's opinions that Mr. Green had "no severe mental impairment" less weight because they were not consistent with the record as a whole. (Tr. 24). However, as the ALJ noted, he did consider Plaintiff's depression and anxiety severe under 20 C.F.R. 404.1520(c). It was therefore within his discretion to weigh these opinions less heavily to the extent that they contradicted the record. Importantly, though they were weighed less heavily, the ALJ clearly discussed these opinions in great detail and considered them carefully.

scope of the Social Security Act" that their use is inappropriate. Resendes v. Astrue, 780 F. Supp. 2d 125, 138 (D. Mass. 2011) (holding that the ALJ erred by failing to consider the record as a whole and by overly relying on claimant's GAF scores to support conclusion that her emotional and cognitive issues were not a severe impairment). In this case, the ALJ's use of GAF scores bolstered, but did not supplant, his more individualized finding of Mr. Green's residual functional capacity. Therefore, the Court finds that the ALJ did not err.

### ii. Dr. Grinspoon's Opinion on Physical Health Issues

Plaintiff argues that the ALJ erred in giving little weight to Dr. Grinspoon's opinion of his physical limitations, of which the osteomyelitis and bowing deformity in his left arm are the most significant and well-documented.[4] Specifically, Plaintiff points to a January 2011 assessment in which Dr. Grinspoon opined that Mr. Green was limited in his ability to reach or to lift or carry even small amounts of weight due to an "infection/scar" on his left arm. (Tr. 1481-84.) This opinion, however, runs contrary to the rest of the record, which demonstrates that although Mr.

---

[4]Plaintiff alleged several physical conditions, including seizures, lower back pain, obesity and mitral valve prolapse. As stated in the facts, Plaintiff's three seizures were isolated in occurrence, two of which were directly linked to his drug abuse and withdrawal. Further, Mr. Green's mitral valve prolapse was only a "potential" concern, as admitted by the Plaintiff himself. Additionally, though Mr. Green's alleged lower back pain and obesity may have caused him discomfort at times, neither his medical records nor his own testimony provided the ALJ with evidence that they constituted a severe impairment for any amount of time. Therefore, this section focuses only on Mr. Green's osteomyelitis and bowing deformity.

Green underwent serious surgery in April 2008, he experienced little long-lasting arm and hand limitations as a result. Plaintiff's post-surgery medical notes demonstrate that he had recovered complete extension in his elbow and substantial increase in his hand strength as soon as May 12, 2008. (Tr. 591.) This successful recovery is consistently noted throughout the record. On May 21, 2008, Plaintiff was frequently using the gym, apparently in such a manner that he had to be advised that it was "not for body building." Id. By March 2009, Mr. Green reported that after his physical therapy he felt that he was "now recovered." (Tr. 1100.) In April 2009, Dr. Mayers noted that while Mr. Green had some decreased range of motion in his wrist and experienced "some discomfort" in flexion and extension of the elbow, overall there was no evidence of osteomyelitis or "other bone or soft tissue abnormality" in his left arm and that he had regained full grip strength in his hand. (Tr. 470.) In October 2009, Dr. Astarijan concluded that Mr. Green's osteomyelitis had been successfully treated, (Tr. 509), and in May 2010, Dr. Monica noted that he had full range of motion of his elbow and wrist and did not report any pain. (Tr. 1254.) Given the consistency and uniformity of these reports, the ALJ had a more than sufficient basis for finding that Mr. Green did not have significant limitations resulting from his osteomyelitis. Consequently, Dr. Grinspoon's opinion, which ran contrary to the record as a whole, merited little weight.

Finally, Plaintiff contends that the ALJ failed to consider the possibility that he might have been disabled for a closed period of time within the period he alleged disability. Under the Regulations, a claimant must show that he has a severe impairment that persists for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509 and 416.909. Plaintiff, relying upon an Eighth Circuit decision, argues that an ALJ is required to consider the possibility that an applicant met this one-year requirement within a longer period of alleged disability, even when a claimant does not ask the ALJ to do so. See Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994) (holding that the ALJ erred because he had failed to sufficiently develop the record such that the he could determine whether the claimant had been disabled for over a period of one year). No Circuit has adopted the Eighth Circuit's reasoning and this Court declines to do so. In any event, Mr. Green's recovery notes suggest that within a month of his surgery, he had recovered much of his extension in his elbow in his hand strength. The rest of his medical records corroborate his quick recovery. (Tr. 1100.) Therefore, the Court finds that the ALJ had substantial evidence in the record on which to base his finding that the Plaintiff was not disabled for any significant amount of time, including any closed periods.

### iii. ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ's assessment of Plaintiff's credibility was flawed and therefore compromised his RFC finding.

Specifically, Plaintiff asserts that the ALJ did not adequately consider and apply the factors set forth in Avery v. Secretary of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986). The court in Avery established that when a claimant alleges pain to an extent not supported by objective medical evidence, "a full description of the individual's prior work record, daily activities and any additional statements from the claimant, his or her treating physician or other third party relative to the alleged pain must be considered." Id. A court may review the entire record to assess whether the ALJ complied with the Avery requirements. Patilla v. Shalala, 21 F.3d 419 (1st Cir. 1994). However, the court gives deference to the ALJ in his interpretation of the credibility of the claimant's testimony. Frustaglia v. Sec'y of Health & Human Services, 829 F.2d 192, 195 (1st Cir. 1987) (finding the ALJ's credibility determination merited deference since it was the ALJ "who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence"). Additionally, while the ALJ must consider each of these factors, "there is no requirement that he make specific findings regarding each of the factors in his written decision." Shields v. Astrue, CIV.A. 10-10234, 2011 WL 1233105 at *11 (D. Mass. Mar. 30, 2011).

In its review, the Court finds that the ALJ met the Avery requirements. At the hearing, the ALJ thoroughly questioned Mr.

23

Green about his physical condition, his daily activities during the relevant time period and his prior work record. Further, Mr. Green's medical records reflect that he felt his arm had "recovered", that he felt like a "healthy person" and that he exercised frequently. (Tr. 1100, 592). The ALJ cited these considerations in his decision, finding that to the extent that Mr. Green's testimony suggested a more substantial limitation than his records indicated, they were "not consistent with the treatment record which indicates greater physical and mental activity to include exercising and attempts to return to school." (Tr. 25). Given these inquiries, the Court finds that the ALJ complied with the <u>Avery</u> requirements and consequently, did not err in assessing Plaintiff's credibility.

**b.   Vocational Expert's Testimony**

Plaintiff argues that the ALJ erred in Step Five of his disability determination for two reasons. First, the ALJ failed to give Plaintiff notice that the VE would testify via telephone and allowed the testimony over his objection. Second, the ALJ accepted the VE's testimony even though he provided incorrect DOT numbers. The Court finds that the ALJ erred in both these respects, but the errors were harmless and remand is inappropriate.

### i.   Telephonic Vocational Expert Testimony

Plaintiff argues that the ALJ erred by failing to provide him with proper notice that the vocational expert witness would testify by telephone. The case law regarding telephonic testimony is sparse. Plaintiff bases his argument on Edwards v. Astrue, 3:10CV1017 MRK, 2011 WL 3490024 (D. Conn. 2011), in which the court found that the ALJ committed legal error by failing to notify the claimant that a medical expert would be testifying by telephone at her hearing. The court reasoned that although there was no regulation that specifically required such notice, it could extrapolate a requirement from 20 C.F.R. § 404.938(b), which requires that the claimant "be told if [the] appearance . . . of any other party or witness is scheduled to be made by video teleconferencing rather than in person."[5] Id. A second Connecticut district court applied this rule in the context of vocational expert telephonic testimony, holding that "while the ALJ's decision to allow the vocational expert to testify telephonically may not amount to a due process violation, it clearly violates the SSA's governing regulations." Koutrakos v. Astrue, 3:11 CV 306 CSH, 2012 WL 1283427 at *8 (D. Conn. Jan. 9, 2012) report and recommendation adopted, 3:11-CV-306 CSH, 2012 WL

---

[5] The fact that the Social Security Hearings, Appeals and Litigation Law Manual ("HALLEX") specifically allows for telephonic testimony does not change the Court's reasoning since it is well established that "[HALLEX] is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees . . . " Schweiker v. Hansen, 450 U.S. 785, 789 (1981).

1247263 (D. Conn. Apr. 13, 2012). This Court agrees. Failure to give notice that a VE will testify by telephone constitutes a violation of the SSA's regulations.

However, this error does not necessarily require remand. Instead, the Court finds that while the improper notice constituted error, the plaintiff must demonstrate that harm or prejudice resulted from the error in order to remand. See Goodwin v. Astrue, No. 11-1751 (1st Cir. 2012) (unpublished) aff'q Goodwin v. Astrue, 10-CV-233-PB, 2011 WL 1630927 (D.N.H. Apr. 11, 2011) report and recommendation adopted sub nom. Goodwin v. US Soc. Sec. Admin., 10-CV-233-PB, 2011 WL 1630282 (D.N.H. Apr. 29, 2011) (affirming district court opinion that admission of telephonic opinion testimony did not require remand, in part because the plaintiff failed to show resulting prejudice and the First Circuit had not barred telephonic testimony and noting that "[m]inimally, the appellant does not show that he suffered any harm with respect to the telephone testimony or administrative procedures."). See also Tardiff v. Astrue, 11-CV-17-JD, 2012 WL 777484 (D.N.H. Mar. 7, 2012) (unpublished) (noting that "[u]nlike the District of Connecticut, this district has not adopted a rule that telephonic testimony cannot be used in a social security hearing when the applicant objects. Instead, this court will consider the circumstances to determine whether telephonic testimony prejudices the claimant.").

Plaintiff fails to provide any evidence that he was

prejudiced by the vocational expert's testimony via telephone. Plaintiff argues that "the ALJ based his ultimate non-disability finding on the improper telephone testimony. For that reason, the ALJ's error cannot be considered harmless." Pl.'s Mot. 13. During the VE's testimony, counsel for Plaintiff had ample opportunity to question him and, in fact, presented him with several variations of the ALJ's original hypothetical questions. (Tr. 75-78.) There is nothing in the record that indicates that the lack of notice that the testimony would be telephonic rather than in person altered counsel's ability to prepare for the cross-examination or that the presentation of the VE's testimony via telephone prejudiced the plaintiff in any way. Therefore, the Court finds that the lack of notice of the vocational expert's appearance via telephone provides no basis for reversal.

### ii.  Dictionary of Occupational Titles Code Numbers

The VE testified before the ALJ that, despite Mr. Green's alleged limitations, he could still perform jobs existing in significant numbers in the national economy. The expert gave two job descriptions as examples of "simple, unskilled" work that a person with Mr. Green's disabilities could perform. (Tr. 73-75.) The first was of a "table worker, which is sedentary, unskilled. There are 15,000 in the national and 3,600 in the state." (Tr. 73-74.) The second was of a "finish inspector. That's light and unskilled. 58,000 nationally, 2,600 in the state." (Tr. 74.) When asked for the corresponding DOT numbers, the VE responded that

they were 379.687-182 and 941.689-101, respectively. (Tr. 75.) These DOT numbers do not correlate with the job descriptions the VE provided.

Social Security Ruling 00-4P provides that occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT" and that, in the face of an "apparent, unresolved conflict," the ALJ must elicit a reasonable explanation before relying on the VE's testimony. Auger v. Astrue, 792 F. Supp. 2d 92, 95 (D. Mass. 2011) (citing SSR 00-4p). Plaintiff argues that the ALJ erred in adopting the VE's testimony and asserting in his decision that it was "consistent with the information contained in the [DOT]" without resolving this conflict. (Tr. 26.) However, failure to resolve a conflict does not necessarily constitute reversible error. Dorego v. Astrue, CIV.A. 10-11768-DPW, 2012 WL 603196 at *16 (D. Mass. Feb. 24, 2012) (holding that there was substantial evidence from which the ALJ could find a significant number of jobs existed in the national economy even though the VE failed to provide ALJ with code numbers, and one job title could not be found in the DOT).

The DOT code "379.687-182" provided by the VE for the job of table worker does not exist in the DOT. However, an entry with the code "739.687-182" reveals a job with the same title. The job described under that code number is a sedentary, unskilled job that does not involve frequent contact with coworkers, of the

kind that the VE described in the hearing. The VE testified that there were 15,000 table worker positions in the national economy and 3,600 in the state. This alone constitutes a substantial number of jobs existing in the local economy. Racicot v. Astrue, CIV A 04-11556-RWZ, 2007 WL 2712488, at *6 n. 4 (D. Mass. Sept. 4, 2007) (finding 140 surveillance system monitor positions in Massachusetts constituted a significant number of jobs). Although the DOT code for finish inspector was also incorrect, there are several listings for "finish inspector" in the DOT, such as that listed under code 741.687-010, which are sedentary and unskilled and do not involve frequent contact with coworkers.

Courts have affirmed ALJ decisions even in cases where the VE provided no DOT code numbers. See Edwards v. Sec'y of Health & Human Services, 34 F.3d 1065 (1st Cir. 1994) (unpublished) (affirming the ALJ decision where VE gave only general job titles since though there were many jobs with a given title, some of which were classified as sedentary and unskilled); see also Pires v. Astrue, 553 F. Supp. 2d 15 (D. Mass. 2008) (finding VE's failure to provide DOT numbers did not preclude the ALJ from relying on VE's testimony). In this case, though the code numbers were incorrect, both job descriptions were readily found in the DOT and corresponded with the description given by the VE of the work that Plaintiff was capable of performing given his residual functional capacity. Therefore, although the ALJ did not reconcile this discrepancy, the error was harmless as the ALJ

still had substantial evidence from which he could conclude that there were a significant number of jobs in the national and local economy that Plaintiff could perform.

### ORDER

The Court ALLOWS Defendant's motion to affirm the Decision of the Commissioner (Docket No. 19) and DENIES Plaintiff's motion to reverse (Docket No. 13).


　　　　　　　　　　　　/s/ PATTI B. SARIS
　　　　　　　　　　　　PATTI B. SARIS
　　　　　　　　　　　　United States District Judge